UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**VINCENT HARRIS**,                    Case No. 1:11 CV 1936

        Plaintiff,                    Judge Donald C. Nugent

    v.                    REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.                    Magistrate Judge James R. Knepp, II

### INTRODUCTION

Plaintiff Vincent Harris appeals the administrative denial of Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383, respectively. The district court has jurisdiction over this case under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). This matter was referred to the undersigned for the filing of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated September 13, 2011). For the reasons given below, the Court recommends the case be remanded to the Commissioner.

### BACKGROUND

Plaintiff filed applications for DIB and SSI on June 22, 2008, alleging a disability onset date of October 15, 2006. (Tr. 142–149). His applications were denied initially (Tr. 94–99) and upon reconsideration (Tr. 101–105). Plaintiff requested a hearing before an Administrative Law Judge (ALJ), but failed to appear and his case was dismissed. (Tr. 88–92, 106–107). The ALJ then vacated his notice of dismissal for good cause shown, and rescheduled the hearing. (Tr. 93). Born in March 1969, Plaintiff was 41 years old at the time of the ALJ's hearing. (Tr. 142).

<u>Medical History</u>

Plaintiff's main medical problems are associated with back pain, poor vision in his left eye, anxiety, and depression. (Tr. 184). Plaintiff told SSA his back pain worsened in September 2009. (Tr. 195). At that time, he indicated he was having a lot of problems taking a shower because of his pain, and trouble leaving the house because of his anxiety. (Tr. 198).

After a face-to-face interview with Plaintiff in July 2008, an SSA employee reported Plaintiff had no difficulty hearing, reading, breathing, understanding, being coherent, concentrating, talking, answering, sitting, standing, walking, seeing, using his hands, or writing. (Tr. 182). Plaintiff was noted to be intelligent and appeared with normal grooming. (Tr. 183). At a subsequent face-to-face interview in October 2008, Plaintiff reportedly had difficulty talking, answering, walking, and standing. (Tr. 192). At that time, the SSA employee conducting the interview remarked Plaintiff "seemed sluggish and slow", and opined that his "allegation[s] of back problems and depression/anxiety are credible." (Tr. 192).

Plaintiff underwent x-rays of his lumbar spine in August 2008. (Tr. 258). The physician interpreting these x-rays concluded they revealed moderate disc narrowing at L4-L5 and anterior spur formation mainly at L4-L5. (Tr. 258). Plaintiff's vertebrae were otherwise normal in height and alignment with no fracture or subluxation. (Tr. 258). His facet joints, sacroiliac joints, pedicles, spinous processes, and pars interarticularis were also all normal. (Tr. 258).

Plaintiff had another x-ray of his lumbar spine in February 2009, which showed small anterior osteophytes and narrowing of L4-L5 and L5-S1. (Tr. 335). The following month, Plaintiff had a lumbar spine MRI without contrast. (Tr. 333–334). The radiologist interpreting this scan, Parvez Masood, M.D., reported congenital central canal narrowing and a loss of normal lumbar

2

lordosis with straightening of the spine. (Tr. 333). Dr. Masood noted posterior bulges and decreased disk height and signal, "indicating disk degenerative disease with endplate changes and osteophytes." (Tr. 333). Stenosis was reportedly "moderate to significant" at L3-L4 and moderate at L4-L5. (Tr. 333). Furthermore, Dr. Masood reported "severe left and moderate right foramina narrowing" at L5-S1. (Tr. 333).

In early March 2009, Plaintiff underwent a lumbar spine assessment at the McKenzie Institute. (Tr. 330–331, 347–355). On examination, a correction of Plaintiff's posture produced lower back pain. (Tr. 331). Plaintiff had no motor loss but a positive straight leg raise test and major loss in extension. (Tr. 331). Plaintiff then began his first round of physical therapy, which ended prematurely in June 2009 when he self-discharged by no-showing and failing to reschedule his appointment. (Tr. 320). Plaintiff's response to treatment during this therapy was generally deemed fair with mixed reports about his pain levels. (Tr. 322–324, 326–329).

In September 2009, Plaintiff began a second course of physical therapy twice a week at the Ashtabula County Medical Center. (Tr. 312–319, 337–343). His initial evaluation indicated he was always in lower back and leg pain that injections did not help. (Tr. 317–318). The same initial evaluation reported Plaintiff "is weight lifting regularly [at the] YMCA – does dead lifts even though painful." (Tr. 318). Progress notes revealed Plaintiff was walking a "couple of blocks" to therapy. (Tr. 337). Plaintiff's therapists indicated he had "not much" pain when he began therapy. (Tr. 316). Later that month, Plaintiff's therapist reported Plaintiff felt some relief from his pain and was feeling better. (Tr. 313–314). At the beginning of October 2009, Plaintiff reported improvement in his pain and his physical therapist indicated he was responding well to treatment. (Tr. 312). However, five days later, Plaintiff reported worse pain that was radiating down his legs. (Tr. 312). In October,

Plaintiff's therapist reported "little progress seen" and referred Plaintiff back to his physician. (Tr. 338). Plaintiff's physical therapists concluded their goals were not met and they were unable to consistently decrease or centralize Plaintiff's pain. (Tr. 337).

Plaintiff's primary care physician referred him to Tagreed Khalaf, M.D., at the Cleveland Clinic Center for Spine Health, whom he saw in December 2009. (Tr. 371). Dr. Khalaf noted a history of depression. (Tr. 372). On examination, Dr. Khalaf reported a normal gait with normal heel and toe walking, normal motor strength, no sensory loss, a limited range of motion in the spine, and negative straight leg raising tests both sitting and supine. (Tr. 372). Dr. Khalaf assessed lumbar spinal stenosis and pain consistent with neurogenic claudication. (Tr. 373). Because of how severe Plaintiff's stenosis is, and his lack of improvement from physical therapy, Dr. Khalaf referred Plaintiff for a surgical consultation. (Tr. 373).

Per Dr. Khalaf's recommendation, Plaintiff had a surgical consultation with orthopaedic surgeon Gordon Bell, M.D. (Tr. 367). Dr. Bell labeled Plaintiff's response to conservative therapy "[n]o help". (Tr. 367). On examination, he noted Plaintiff had a negative straight leg raising test, a "normal, although somewhat deliberate" gait, and symmetric reflexes. (Tr. 368–369). Dr. Bell informed Plaintiff that surgery could help his leg pain "but may have no effect on his back pain." (Tr. 369). Plaintiff elected to defer his decision on undergoing surgery. (Tr. 369).

Plaintiff followed up with Dr. Khalaf soon after his surgical consult. (Tr. 363). Dr. Khalaf noted no weakness in Plaintiff's legs, but complaints of pain down the back of both thighs. (Tr. 363). On examination, Plaintiff was able to walk on his toes and heels, as well as do a tandem gait, without difficulty. (Tr. 363). Plaintiff also had a full range of motion and full flexion in his lumbar spine. (Tr. 363). Treatment notes from this office visit indicate Plaintiff still wanted to think further

4

about surgery. (Tr. 364). They also report Plaintiff has a history of depression and was advised to continue seeing his psychiatrist. (Tr. 364).

In March 2010, Plaintiff followed up with Dr. Khalaf again. (Tr. 359). On examination, Plaintiff was able to walk on toes and heels without difficulty and had a full range of motion in his lumbar spine. (Tr. 359). Plaintiff did not complain of numbness or tingling. Dr. Khalaf assessed lumbar spondylosis, degeneration of lumbar or lumbosacral intervertebral disc, and lumbar stenosis. (Tr. 360). His notes indicate Plaintiff had "decided to proceed with his surgical options". (Tr. 360).

Meanwhile, Plaintiff was assessed by psychiatrist Dennis Ugboma, M.D., at the end of March 2010. (Tr. 384–385). Several times, Plaintiff had complained of depression to his primary care physician. (Tr. 388–389, 392–393, 395). Dr. Ugboma noted this history of depression, as well as occasional difficulties with concentration and appetite, and daily anxiety, but reported Plaintiff denied irritability or anger difficulties. (Tr. 384). Dr. Ugboma indicated Plaintiff smokes three to four joints of marijuana a week, and has been using it since he was eighteen. (Tr. 384). On examination, Dr. Ugboma found Plaintiff to have a depressed mood, but saw no evidence of agitation or abnormal movements, no delusional thinking, no looseness of association, and good insight and judgment. (Tr. 384). Dr. Ugboma assigned Plaintiff a GAF score of 55, and diagnosed major depressive disorder, anxiety disorder, and cannabis abuse. (Tr. 385).

In June, Dr. Ugboma filled out a mental RFC form indicating Plaintiff has marked limitations on his activities of daily living, in maintaining social functioning, and in his ability to complete a normal workday without interruptions from psychologically based symptoms. (Tr. 410–411). Dr. Ugboma specified Plaintiff's impairments would probably require him to be absent from work more than three times a month. (Tr. 411). He reported Plaintiff has deficiencies of concentration,

persistence, and pace, and repeated episodes of deterioration or decompensation. (Tr. 410). Dr. Ugboma also opined Plaintiff has moderate limitations in eleven functional areas. (Tr. 411).

Also in June 2010, Plaintiff's therapist at the Community Counseling Center, Craig Palmer, filled out a mental RFC form in which he check-marked the "extreme" box for all functional areas. (Tr. 418). However, when asked when this disabling condition began, Palmer wrote March 2010. (Tr. 419).

Since applying for benefits, Plaintiff has had numerous RFC assessments conducted. In July 2008, consultant psychologist James Cozy assessed Plaintiff's mental RFC. (Tr. 253–254). Cozy determined Plaintiff is extremely limited in his ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 253). Cozy also found moderate limitations in Plaintiff's ability to understand, remember, and carry out detailed instructions. (Tr. 253). Cozy remarked that Plaintiff has "some difficulty with memory and attention but other[w]ise has no problem working around people." (Tr. 254). Plaintiff told Cozy he is easily distracted. (Tr. 254).

The same month, consultant physician Richard Krajec, M.D., examined Plaintiff at the request of the Department of Job and Family Services in support of Plaintiff's Medicaid application. (Tr. 255–257). Dr. Krajec noted Plaintiff smoked a pack of cigarettes a day for nearly 20 years, but that he quit smoking, quit drinking, and quit using marijuana around April 2008. (Tr. 257). Dr. Krajec reported Plaintiff has problems swallowing, a history of uncorrected poor vision, occasional

6

dizziness, and pain in his legs with exertion. (Tr. 257). He also reported Plaintiff "gets anxious at times." (Tr. 257).

On examination, Dr. Krajec found Plaintiff to be "very well-nourished" and "very muscular." (Tr. 257). Dr. Krajec reported Plaintiff "could touch the floor with no difficulty", he could twist fully, and his spine was straight and non-tender. (Tr. 257). A straight leg raising test was "negative at 90 degrees in the sitting position with no discomfort." (Tr. 257). Dr. Krajec screened Plaintiff's vision and reported 20/200 sight in both eyes, saying this makes him "probably legally blind." (Tr. 257). Dr. Krajec summarized his findings:

> [Plaintiff] talks about back pain, but there is no evidence of any problems with his neck at this time. He talks about memory loss; but he remembered the doctor he saw four years ago for his back, whom he saw only a few times. I think the major limitation to his ability to work is going to be his vision. As to the memory loss, he probably needs a psychological evaluation. Otherwise, physically he seems capable of working.

(Tr. 257).

In September 2008, Plaintiff was evaluated by consultant physician Mary-Helene Massullo, D.O. (Tr. 262–265). Dr. Massullo noted Plaintiff indicated he has pain in the L4 to S1 region going out to the flanks bilaterally and down the posterior lateral left lower extremity. (Tr. 262). She reported Plaintiff claimed he cannot walk far, but he can ascend and descend stairs. (Tr. 263). With respect to Plaintiff's drug and alcohol use, Dr. Massullo reported Plaintiff told her he only drinks two or three times a year and he last used marijuana in 1998. (Tr. 263).

Dr. Massullo screened Plaintiff's vision and reported 20/70 in the right eye, 20/200 in the left eye, and 20/70 with both eyes. (Tr. 263). On examination, Dr. Massullo noted Plaintiff stands at approximately fifteen degrees bent over to the left side, but his "gait was normal" and he "has no need for an ambulatory aid." (Tr. 264). Plaintiff had no restrictions of motion and was able to grasp

7

and manipulate with each hand. (Tr. 264). Dr. Massullo tested Plaintiff's muscle strength and determined he has completely normal muscle strength with no spasms, atrophy, spasticity, clonus, or primitive reflexes. (Tr. 267–268). Plaintiff also showed a completely normal range of motion. (Tr. 268–270).

Dr. Massullo noted Plaintiff's "mental status appeared normal". (Tr. 265). She concluded Plaintiff is not statutorily blind, but because of his discogenic degeneration, "any prolonged walking, standing, lifting using his lower back, [or] traveling using his lower back at this point in time may be slightly compromised. Any work related activity from a seated position using his upper extremities does not appear to be compromised whatsoever." (Tr. 265).

In October 2008, Plaintiff's mental RFC was assessed by consultant psychologist Richard Halas, M.A, who conducted an interview with Plaintiff. (Tr. 271–277). Halas gave a stark assessment, determining Plaintiff is markedly or extremely limited in a slew of functional abilities. (Tr. 271). Halas noted Plaintiff's anxious presentation, but said he was coherent and had no problems with fragmentation of thought or flight of ideas. (Tr. 273). However, Halas reported Plaintiff had a flat affect and depressed mood with a below average energy level and psychomotor activity reflecting retardation. (Tr. 274). Halas said Plaintiff "shows to have relatively high levels of anxiety" because of his tendency toward fidgeting, remarking this is consistent with an anxiety disorder. (Tr. 274). But Halas reported no phobic behavior, panic attacks, hallucinations, delusions, or paranoid ideations. (Tr. 274).

Halas deemed Plaintiff's overall quality of consciousness as good, noting no confusion or lack of awareness. (Tr. 274). Plaintiff reportedly described his physical health to Halas as being good. (Tr. 275). In describing Plaintiff's daily activities, Halas said Plaintiff "does all his own

8

cleaning, laundry, and shopping", but his emotional problems keep him from working. (Tr. 275–276). After conducting personality testing, Halas reported Plaintiff "is confused and struggles with his own personal identity. . . . This is ultimately an individual who over reacts to minor stresses, pressures, changes and disruptions in his environment." (Tr. 276). Has concluded Plaintiff "is significantly depressed, anxious, pessimistic, angry and introverted", and "has a propensity towards using drugs and alcohol as a way of dealing with emotional issues, depression and anxiety." (Tr. 276). Halas determined Plaintiff's "levels of adjustment preclude him from employability and restrict his inner personal relationships. . . . He requires psychotropic medications, individual counseling to improve self image[,] and treatment for depression and anxiety[,] all [of] which are imperative at this time." (Tr. 277). He assigned Plaintiff an overall GAF score of 45. (Tr. 277).

Consultant psychologist Todd Finnerty, Psy.D., assessed Plaintiff's mental RFC in December 2008. (Tr. 280–297). Dr. Finnerty found only moderate limitations in aspects of Plaintiff's social interaction, his ability to sustain concentration and pace, and his ability to adapt appropriately to changes in the work setting. (Tr. 281, 294). He also found a mild limitation on Plaintiff's activities of daily living. (Tr. 294). He opined the limitations noted by Halas were not supported by the medical evidence, and called into question the reliability of the test results relied on by Halas. (Tr. 282). That is, on the tests, Plaintiff marked "true" for statements such as "[e]vil spirits possess me at times" and "[t]here are persons who are trying to steal my thoughts and ideas", even though Halas found no signs Plaintiff has psychotic processes. (Tr. 282). Dr. Finnerty concluded Plaintiff has major depression, generalized anxiety, and mixed personality disorder, but retains the capacity to perform work in a setting with superficial interaction with others, where duties are relatively static

9

and any changes can be explained, and where he has no fast-paced production quotas. (Tr. 283, 287, 289, 291).

Also in December 2008, consultant physician Teresita Cruz, M.D., reviewed Plaintiff's file and concluded there was no evidence showing "a severe physical impairment that would limit functioning". (Tr. 298). This assessment was later affirmed by consultant John Parker, M.D., who also disagreed with some of Dr. Finnerty's conclusions. (Tr. 307, 310).

In January 2010, Plaintiff's physical RFC was assessed once more by consultant physician Navjeet Singh, M.D. (Tr. 299–306). Dr. Singh found Plaintiff's allegations "mostly credible" and noted Plaintiff denied using an assistive device for ambulation. (Tr. 301, 304). Dr. Singh determined Plaintiff could lift or carry 20 pounds occasionally and ten pounds frequently, and could stand, walk, or sit for about six hours in an eight-hour workday. (Tr. 300). Dr. Singh found no visual limitations, no manipulative limitations, no communicative limitations, and no limitations on Plaintiff's ability to push or pull. (Tr. 300–303). Dr. Singh also said Plaintiff is limited to only occasionally climbing, balancing, stooping, kneeling, crouching, or crawling. (Tr. 301).

Plaintiff underwent another mental health assessment by consultant psychologist James Cozy in March 2010. (Tr. 377–383). Cozy reported Plaintiff "is currently trying to obtain SSI services due to back pain and has requested an adult case manager to help him maneuver the SSI system." (Tr. 377). He reported Plaintiff experiences back pain, depression symptoms, anxiety symptoms, panic attacks, and mood swings. (Tr. 377–378). Cozy also mentioned Plaintiff likes to do bodybuilding. (Tr. 377). He determined Plaintiff has a logical thought process, depressed mood, full affect, fair insight and judgment, and average intelligence. (Tr. 382).

10

Administrative Hearing

Plaintiff appeared with counsel at a video hearing before the ALJ on June 10, 2010. (Tr. 31). Vocational expert (VE) Robert Edwards also appeared. (Tr. 31). Plaintiff appeared at the hearing with a cane. (Tr. 35). He testified he was prescribed a cane by one of his doctors and rarely leaves the house without it. (Tr. 35–36).

Plaintiff testified he lives with his mother, who is in good health. (Tr. 35). He said he graduated from high school and has not worked since 2006 because of his anxiety, depression, and pain. (Tr. 35, 37). Plaintiff went through physical therapy twice for his back pain before being referred to a spine specialist. (Tr. 37–38). The ALJ asked Plaintiff about his ability to exercise, and Plaintiff said he went to the YMCA in September 2009 to do more walking per instructions from his physical therapists. (Tr. 38). Plaintiff denied doing weight lifting there; he said the reports of him doing dead lifts at the YMCA were incorrect. (Tr. 38–39).

Plaintiff testified about his physical RFC, which he said is limited because of his back pain. (Tr. 41). He said he could lift or carry about ten or fifteen pounds, but is always in pain whether he is sitting, standing, or walking. (Tr. 39–40). Plaintiff testified he can normally sit for about ten to fifteen minutes before needing to stand up, unless the chair he is sitting in is extra comfortable. (Tr. 40). However, he said he can only stand for five to ten minutes before needing to sit back down. (Tr. 40, 65). Plaintiff said he could walk 25 to 50 feet. (Tr. 41). Even with his cane, Plaintiff said he cannot stand up straight, but with his cane he could probably stand for fifteen minutes. (Tr. 51, 65). During the hearing, Plaintiff stood up twice for about five minutes each time. (Tr. 50, 57).

Plaintiff also testified about his mental RFC. He said he gets really nervous and "just can't function around a lot of people." (Tr. 45). He does have one or two friends and gets along with his

11

family members. (Tr. 45). He is capable of bathing, dressing, grooming, and feeding himself. (Tr. 46). However, Plaintiff said he has a hard time getting to appointments because his anxiety and depression will make him unable to move. (Tr. 46). Plaintiff watches television, handles his own finances, and is capable of driving although his license was suspended due to unpaid fines from a DUI. (Tr. 47–48). Plaintiff can use a microwave to prepare simple meals, but does not do laundry or go shopping. (Tr. 48–49). Most of the day, Plaintiff said he stays in his room lying on his bed because he feels stuck there. (Tr. 50). He has his mother shop for him because he has too much anxiety about being around all the people in a store. (Tr. 57). Plaintiff admitted to having suicidal thoughts because "life is just too . . . hard", but said he has never attempted suicide. (Tr. 58). Out of a twelve-hour day, from the time Plaintiffs wakes up until he goes back to sleep at night, he estimated he usually spends ten or eleven of those hours in his room or in bed. (Tr. 62).

Plaintiff said he has not had any improvement from medication in his anxiety or depression. (Tr. 60). He did have improvement from one of his sleeping medications, but because he was sleeping so much, he did not feel better. (Tr. 61–62). Plaintiff said he slept so much that he kept an old milk jug by his bed so that when he would wake up, he would not have to leave the room to use the bathroom before going back to sleep. (Tr. 61).

Plaintiff said he used to smoke marijuana, but last used it five or six months before the hearing. (Tr. 53). He said he used marijuana to calm down from his anxiety, and it helped him. (Tr. 53–54). Plaintiff denied ever having an alcohol problem, despite getting a DUI in January 2009. (Tr. 54).

Plaintiff testified about his mental health, saying he receives treatment at the Ashtabula Community Counseling Center, where he sees a counselor once a week. (Tr. 41–42, 44). The ALJ

asked Plaintiff about the Counseling Center's record indicating Plaintiff asked how to "maneuver the SSI system." (Tr. 42). In response, Plaintiff refuted the notion he ever said anything about maneuvering the system. (Tr. 42).

The VE testified and identified Plaintiff's prior relevant work as mainly medium exertional, unskilled work. (Tr. 68). The ALJ then posed a hypothetical question, asking the VE to assume an individual of the same age, education, and work background of Plaintiff, but having the following restrictions: could only perform light work that does not require more than occasional postural activities; would have no fine visual acuity; could not have exposure to heights or hazards; could only have occasional contact with coworkers, supervisors, or the general public; and would only be capable of simple, routine, one- or two-step activities as a result of moderate limitations in concentration, persistence, or pace. (Tr. 68). Such a person, the VE testified, could perform some of Plaintiff's past work as a clothes sorter and possibly a laborer. (Tr. 68–69). The VE testified the hypothetical individual could also perform the jobs of housekeeping cleaner, hand packer, or small products assembler, each of which accounts for thousands of positions in the regional economy. (Tr. 71).

The ALJ asked the VE whether any work would be possible if Plaintiff's testimony about his ability to walk, stand, or sit is credible. (Tr. 71). The VE responded no work would be possible. (Tr. 71). Similarly, the VE said no work would be possible if Plaintiff has a marked or extreme limitation in his social functioning and his concentration, persistence, and pace. (Tr. 71). Upon further questioning by Plaintiff's counsel, the VE said an individual could not work if his mental capabilities requires him to be absent more than three times a month, or if he is impaired twelve to eighteen percent of the day in various abilities. (Tr. 81).

<u>The Commissioner's Decision</u>

The ALJ issued an unfavorable decision on June 29, 2010. (Tr. 9–23). He determined Plaintiff met the insured status requirement for DIB until June 30, 2007; that Plaintiff has the severe impairments of back disorder, mood disorder, anxiety disorder, personality disorder, and low vision; that Plaintiff's impairments do not meet or equal a listing; and that Plaintiff is still capable of performing past relevant work and additional jobs in the regional economy. (Tr. 14–23). Thus, the ALJ found Plaintiff not disabled. (Tr. 23).

Plaintiff requested review of the ALJ's decision. (Tr. 8). The Appeals Council incorporated additional evidence into the record, but denied review on July 11, 2011, making the ALJ's denial the final decision of the Commissioner. (Tr. 1–5). Plaintiff thereafter filed the instant lawsuit.

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc.*

*Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 1382(a)(1), 423(a)(1)(E). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets

15

the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff now challenges the ALJ's decision on two grounds: that the ALJ incorrectly evaluated the medical evidence in the record, and that the ALJ failed to include all of Plaintiff's mental limitations in his hypothetical question to the VE. These arguments are addressed in turn.

### *Treating Physician Rule*

Plaintiff's first argument invokes the hierarchy of medical opinions created by the Commissioner's regulations. Specifically, Plaintiff argues the ALJ erred by giving less than significant weight to the opinions of medical sources Cozy, Krajec, Halas, and Ugboma.

Generally, the medical opinions of treating physicians are accorded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.*    The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* The "good reasons" given by an ALJ to discount a treating source's opinion must be "supported by the evidence in the case record". *Id.* at 406–407 (quoting SSR 96-2p, 1996 WL

16

374188, at *5). A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243). Accordingly, failure to given good reasons requires remand. *Id.* at 409–410.

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. A medical provider is *not* considered a treating source if the claimant's relationship with them is based solely on the claimant's need to obtain a report in support of their claim for disability. 20 C.F.R. § 404.1502. Non-treating sources are physicians, psychologists, or other acceptable medical sources who have examined the claimant but do not have, or did not have, an ongoing treatment relationship with them. 20 C.F.R. § 404.1502. This includes a consultative examiner. 20 C.F.R. § 404.1502. Generally, more weight is given to the opinion of a non-treating source than that of a non-examining source. 20 C.F.R. § 404.1527(c)(1).

Last in the hierarchy of medical sources are non-examining sources. These are physicians, psychologists, or other acceptable medical sources who have not examined the claimant but provide a medical or other opinion. 20 C.F.R. § 404.1502. This includes State agency medical and psychological consultants. 20 C.F.R. § 404.1502. The ALJ "must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence", except for the ultimate determination about whether the individual is disabled. 20 C.F.R. § 404.1527(e)(2)(ii).

<u>Cozy</u>

17

Consultant psychologist James Cozy assessed Plaintiff's mental RFC and determined he has extreme or moderate limitations in a handful of functional abilities. (Tr. 253–254). Cozy opined Plaintiff is unemployable. (Tr. 254). The record indicates Cozy examined Plaintiff in July 2008 to make these conclusions, but no ongoing treatment relationship existed between Cozy and Plaintiff. (Tr. 254). Therefore, Cozy is a non-treating source.

In weighing Cozy's opinion, the ALJ said the following:

> James Cozy, a psychologist who completed a mental functional capacity assessment for the Ashtabula County Department of Job and Family Services, concluded on July 8, 2008 that [Plaintiff] showed some difficulty with memory and attention, and stated that [Plaintiff] was unemployable. However, there was no substantiation for his conclusions in the record. . . . In making the above findings, the undersigned does not give significant weight to the medical source opinions given by [Cozy and others] that [Plaintiff] is unemployable. . . . The medical professionals giving the opinions in the aforementioned exhibits are not treating sources, [and] the medical record as a whole does not support their conclusions[.]

(Tr. 19–21). On review, the ALJ did not err in his treatment of Cozy's opinion.

First, whether Plaintiff is employable or not is not a medical issue, but, rather, an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1). As such, the ALJ rightly gave no "special significance" to Cozy's opinion on this issue. *See* 20 C.F.R. § 404.1527(d)(3). Second, because Cozy is a non-treating source, the weight given his opinion depends "on the degree to which [he] provide[s] supporting explanations" for his opinion, *see* 20 C.F.R. § 404.1527(c)(3), and Cozy provided almost no supporting explanation for his opinion that Plaintiff has several moderate to extreme limitations. Cozy's two-page report includes a page of check-marked boxes and a page containing two hand-written sentences under the heading of "observations and/or medical evidence [that] led to your findings". (Tr. 253–254). In the explanation explaining his findings, Cozy merely recited that Plaintiff "presents some difficulty with memory and attention" and "is easily distracted"

18

according to Plaintiff himself. (Tr. 254). Given the severity level of limitations Cozy assigned, the ALJ's determination that Cozy's opinion lacked substantiation is supported by substantial evidence.

Third, the ALJ's contention that the medical record as a whole does not support Cozy's conclusion of unemployability is itself supported by substantial evidence. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion."). Though plenty of medical evidence suggests Plaintiff has some psychological impairment (Tr. 364, 384, 388–389, 392–393, 395), scant record evidence supports the severity of limitations Cozy determined Plaintiff has. Plus, Cozy's second assessment in March 2010 made no mention of extreme limitations. (Tr. 377–383). To the contrary, in the second assessment Cozy found Plaintiff to have fair insight and judgment, to be motivated for treatment, and to reportedly do bodybuilding and spend time with his daughter. (Tr. 377–381). In sum, the ALJ followed the regulations with his treatment of Cozy's opinion and his determination it is not entitled to significant weight is supported by substantial evidence.

Dr. Krajec

Plaintiff was examined by consultant physician Dr. Krajec for a physical in July 2008, upon the request of the Department of Job and Family Services. (Tr. 257). Dr. Krajec did not have a treatment relationship with Plaintiff. Accordingly, Dr. Krajec is a non-treating source. Plaintiff offers little argument on why the ALJ erred in his treatment of Dr. Krajec's opinion. As the ALJ discussed, Dr. Krajec's findings were about Plaintiff's physical condition:

> The first medical evidence in the record associated with [Plaintiff's] physical impairments is that of Richard Krajec, M.D., a doctor who performed a physical examination on [Plaintiff] for the Ashtabula County Department of Job and Family Services. At an exam on July 9, 2008, Dr. Krajec noted that [Plaintiff's] spine was straight and nontender, and that [Plaintiff] could touch the floor with no difficulty and twist fully. At that time, Dr. Krajec found [Plaintiff's] vision to be 20/200 in

19

both eyes. Dr. Krajec concluded that [Plaintiff] is physically capable of working, but
further opined that he was unemployable, because he needed an eye examination and
a psychiatric evaluation. . . .

[T]he undersigned does not give significant weight to the medical source opinions
given by [Dr. Krajec and others] that [Plaintiff] is unemployable . . . The medical
professionals giving the opinions in the aforementioned exhibits are not treating
sources, [and] the medical record as a whole does not support their conclusions[.]

(Tr. 18).

Dr. Krajec deferred any psychological findings. (Tr. 257). And, as discussed above, Dr.

Krajec's opinion Plaintiff is unemployable is an issued reserved to the Commissioner and therefore

entitled to no significance. 20 C.F.R. § 404.1527(d)(1)–(3). Plaintiff presumably argues about the

weight given to Dr. Krajec's opinion because of his findings regarding Plaintiff's vision.

The regulations define blindness as central vision acuity of 20/200 or less in the better eye

with the use of correcting lens. 20 C.F.R. § 404.1581. Thus, if Dr. Krajec's vision assessment is

correct, and Plaintiff meets the duration requirement in 20 C.F.R. § 404.1509, then Plaintiff could

be blind for purposes of the disability analysis. But, as the ALJ correctly noted, the medical record

as a whole does not support Dr. Krajec's findings. Dr. Massullo tested Plaintiff's vision in

September 2008 and reported acuity of 20/70 in the right eye, 20/200 in the left eye, and 20/70 in

both eyes. (Tr. 263). She concluded Plaintiff "is not statutorily blind." (Tr. 265). In addition, medical

consultant Dr. Singh determined Plaintiff has no visual limitations. (Tr. 302). Also, consultant Dr.

Finnerty called Plaintiff's vision allegations into question, noting "[w]hile he may be 'legally blind'

he apparently completed a 567 question MMPI-2 with Mr. Halas at a psych eval for JFS, reportedly

enjoys watching the History Channel[,] and his ADLS are independent. There is no indication that

vision problems had an impact on the results of his MMPI-2." (Tr. 282). Overall, substantial

evidence supports the ALJ's conclusion that the medical record as a whole does not support Dr.

20

Krajec's opinion, and the ALJ did not err by giving it less than significant weight.

Halas

Consultant psychologist Richard Halas interviewed Plaintiff for an individual psychological evaluation in October 2008. (Tr. 273). As part of the evaluation, Halas conducted personality testing. (Tr. 273). There was no ongoing treatment relationship between Halas and Plaintiff. Accordingly, Halas is a non-treating source. The ALJ thought Halas' opinion conflicted with his own observations:

> Richard C. Halas, who performed a psychological evaluation on [Plaintiff] for the Ashtabula County Department of Job and Family Services, observed [Plaintiff] to have good consciousness, memory, and cognitive functioning, and did not notice anything unusual in his appearance or behavior at all, except to the extent he exhibited some anxiety and his mood reflected depression. However, after examining [Plaintiff's] personality tests, []Halas concluded that []he has significant and severe psychological and emotional problems, struggles with his levels of adjustment, and has high depression levels, all of which restrict him from employability. Personality testing further indicated that [Plaintiff] is likely to be difficult in interpersonal relationships, overreacts to changes or disruptions in his environment, and is significantly depressed, anxious, and angry. []Halas ultimately diagnosed [Plaintiff] with major depression, recurrent type, generalized anxiety disorder, and mixed personality disorder including histrionic, dependent with paranoid and schizoid features. . . .
>
> The undersigned does not give significant weight to the medical source opinions given by [Halas and others] that [Plaintiff] is unemployable. . . . The medical professionals giving the opinions in the aforementioned exhibits are not treating sources, the medical record as a whole does not support their conclusions, and in the case of []Halas, his own examination notes and observations of [Plaintiff] significantly conflict with his conclusion that [Plaintiff] cannot work.

(Tr. 19–21).

On review, the ALJ's determination that Halas opinion deserves less than significant weight because it is inconsistent with his own observations is supported by substantial evidence. Halas' stark assessment of Plaintiff appears to be based primarily on the results of his personality testing.

21

When Halas interviewed Plaintiff, he found him well-oriented, coherent, and having a good overall quality of consciousness. (Tr. 273–275). On the tests Halas administered, Plaintiff marked as "true" such statements as "[e]vil spirits possess me at times"; "I believe I am being plotted against"; "[a]t one or more times in my life I felt that someone was making me do things by hypnotizing me"; "[s]omething has been trying to influence my mind"; and "I hear strange things when I am alone." (Tr. 279). But Halas observed Plaintiff has no phobic behavior, no hallucinations, no delusions, no paranoid ideation, no symptoms of a thought disorder, and no psychotic processes. (Tr. 274). Moreover, no record evidence suggests Plaintiff has any these issues. The reliability of the test results, and Halas' resulting opinion about Plaintiff's ability to function, are thus suspect to say the least, as Dr. Finnerty noted in his assessment of Plaintiff. (Tr. 282). Accordingly, the ALJ's conclusion that Halas' opinion conflicts with his own observations is supported by substantial evidence, and the ALJ did not err by giving it less than significant weight.

Dr. Ugboma

Dr. Ugboma is a psychiatrist at the Community Counseling Center whom Plaintiff saw for treatment in March 2010. (Tr. 384–385). The record contains a medical statement Dr. Ugboma filled out in June 2010 in which he opined Plaintiff has several moderate and marked functional limitations. (Tr. 410–413). The ALJ thought Dr. Ugboma's opinion was too extreme:

> The undersigned also gives little weight to the medical source opinions of Dr. Dennis I. Ugboma and Craig Palmer[.] Dr. Ugboma and Mr. Palmer, a therapist from the Community Counseling Center, each completed a "Medical Statement Concerning Depression with Anxiety, OCD, PTSD, or Panic Disorder" for the record, shortly before the hearing. Dr. Ugboma opined that [Plaintiff] has marked limitations in his activities of daily living and social functioning, deficiencies of concentration, persistence, or pace, and repeated episodes of decompensation. He also noted a great deal of moderate and marked work limitations. He stated [Plaintiff] has been diagnosed with depressive and anxiety disorders, and concluded [Plaintiff's] condition would deteriorate if he w[ere] placed under the stress of a job. Mr.

22

> Palmer's assessment was even more restrictive . . . . The opinions of Dr. Ugboma and
> Mr. Palmer are very extreme and are accorded little weight, given [Plaintiff's] lack
> of hospitalizations, lack of emergency room visits, limited psychological treatment,
> and the conservative medications utilized.

(Tr. 21). On review, the ALJ did not err with his treatment of Dr. Ugboma's opinion.

The Sixth Circuit has found that a single visit to a physician does not constitute an ongoing treatment relationship. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506–508 (6th Cir. 2006) (citing *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005); *Cunningham v. Shalala*, 880 F. Supp. 537, 551 (N.D. Ill. 1995)). Such physicians are merely examining medical sources. *Id.* at 508. In this case, the transcript contains records of Plaintiff visiting Dr. Ugboma only once. (Tr. 384–385). This is insufficient to constitute "an ongoing treatment relationship" under 20 C.F.R. § 404.1502. Therefore, Dr. Ugboma is a non-treating source; his opinions are not entitled to controlling weight absent good reason.

Substantial evidence supports the ALJ's contention that Dr. Ugboma's opinion is more extreme than Plaintiff's treatment history suggests. The transcript contains no record of Plaintiff ever being hospitalized, or ever visiting an emergency room, for psychological impairments. Though Plaintiff was reportedly treated by therapists at the Community Counseling Center in years prior, the record contains only one such visit, in March 2010. (Tr. 384). At that visit, Plaintiff told Dr. Ugboma he was feeling less depressed and had not been taking the medication his primary care physician had prescribed him. (Tr. 384). Dr. Ugboma altered Plaintiff's medications and told him to continue individual therapy. (Tr. 385). This one visit, along with the occasional mention of depression and anxiety in notes by Plaintiff's primary care physician (Tr. 388–389, 392–393, 395), suggests Plaintiff has some psychological limitations, but does not support the conclusion he has moderate or marked limitations in almost every functional area, as Dr. Ugboma contended

23

(Tr. 411–412). Substantial evidence supports the ALJ's contention that the record as a whole shows less severe limitations than those suggested by Dr. Ugboma.

Plaintiff argues the ALJ impermissibly substituted his medical judgment for that of Plaintiff's physicians, but limited or conservative treatment and a lack of hospitalizations can provide support for an ALJ to discount a medical opinion. *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 806 (6th Cir. 2011) ("the ALJ reasonably viewed Francis's limited treatment as inconsistent with Dr. Wakham's opinion"); *Philips v. Comm'r of Soc. Sec.*, 2012 WL 28335, at *6 (N.D. Ohio 2012) ("it was proper for the ALJ to evaluate Dr. Tran's findings in comparison with Plaintiff's lack of hospitalizations and conservative treatment"); *Bush v. Astrue*, 2011 WL 3444072, at *12 (M.D. Tenn. 2011) (finding the ALJ did not err in discrediting the GAF scores assigned by various psychologists in part because they were inconsistent with the claimant's very limited treatment history). Contrary to Plaintiff's argument, the ALJ did not make a medical judgment about Plaintiff's treatment history. This is not a case like *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006), where the ALJ discredited the claimant's headache pain because his doctors failed to prescribe specific headache medications. Rather, here, the ALJ merely compared Plaintiff's treatment history to the severity level of limitations assigned by Dr. Ugboma and deemed them incongruent. Because substantial evidence supports this conclusion, the ALJ did not err with his treatment of Dr. Ugboma's opinion – especially considering it is not entitled to controlling weight in the first place.

### *Mental Limitations in the ALJ's Hypothetical*

Plaintiff also argues the ALJ's controlling hypothetical to the VE and his ultimate RFC finding do not sufficiently accommodate the limitations the ALJ found Plaintiff has. Specifically, Plaintiff cites *Ealy v. Commissioner of Social Security*, 594 F.3d 504 (6th Cir. 2010), and its progeny

to argue the ALJ did not accurately convey Plaintiff's concentration, persistence, and pace impairments. In the ALJ's hypothetical, he included the limitation of "at most only simple and routine, one or two step activities or tasks as a result of moderate limitations in concentration, persistence, or pace." (Tr. 68). In his decision, the ALJ found Plaintiff has an RFC limited to "only simple, routine, repetitive, one or two step tasks", and used the jobs supplied by the VE in response to his hypothetical to make a step five determination of not disabled. (Tr. 21–23).

In order for a VE's testimony in response to a hypothetical question to serve as substantial support for the conclusion a claimant can perform other work, the hypothetical must accurately portray a claimant's physical and mental impairments. *Ealy*, 594 F.3d at 504 (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). In *Ealy*, the Sixth Circuit found the functional restrictions recited in an ALJ's hypothetical question insufficient to accommodate for the claimant's medically-established difficulties in concentration, persistence, and pace because the hypothetical omitted speed- and pace-based restrictions completely and instead only limited the individual to simple, repetitive tasks. *Id.* at 516. This prevented the VE's testimony from being substantial support for the Commissioner's decision at step five.

Moderate limitations in concentration, persistence, and pace require more accommodation than merely a limitation to simple, repetitive tasks. *See, e.g., Edwards v. Barnhart*, 383 F.Supp.2d 920, 930 (E.D. Mich. 2005) ("Plaintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job."); *Johnson v. Astrue*, 2010 WL 5559542, at *8 (N.D. Ohio 2010) ("[T]here is a body of case law supporting the proposition that hypotheticals limiting claimants to jobs entailing no more than simple, routine, and unskilled work are not adequate to convey *moderate* limitations in ability to concentrate, persist, and keep pace."). Put

25

simply, "the difficulty of a task is not equivalent to the difficulty of staying on task." *Hicks v. Comm'r of Soc. Sec.*, , 2011 WL 6000714, at *7 (E.D. Mich 2011).

Time after time, this district has applied *Ealy* and remanded decisions of the Commissioner following an ALJ's hypothetical that failed to adequately convey moderate concentration, persistence, and pace difficulties. *See Titus v. Astrue*, 2011 WL 6986793, at *6–8 (N.D. Ohio 2011) ("'entry-level' work is not an adequate proxy for [concentration, persistence, and pace] limitations because it does not account for any speed or pace-based restrictions"); *Frye v. Astrue*, 2012 WL 1831548 (N.D. Ohio 2012) (hypothetical limiting plaintiff to "simple, routine and repetitive tasks" does not convey plaintiff's moderate difficulties in concentration, persistence, and pace); *Szymanski v. Comm'r of Soc. Sec.*, 2011 WL 4541294, at *14–15 (N.D. Ohio 2011) (hypothetical restricting plaintiff to simple, repetitive tasks is insufficient to convey moderate limitations on maintaining concentration, persistence, or pace); *Alexander v. Comm'r of Soc. Sec.*, 2012 WL 1658707, at *8 (N.D. Ohio 2012) (hypothetical limiting plaintiff to simple, routine work is not enough to convey his moderate limitations in maintaining concentration, persistence, or pace); *McNemar v. Astrue*, 2011 WL 5554051, at *8 (N.D. Ohio 2011) ("Case law from this district and the Sixth Circuit suggests that the ALJ's hypothetical question or RFC must state something more than merely a limitation to simple, repetitive, and routine work in order to properly account for a plaintiff's moderate deficiency in concentration."); *Miller v. Comm'r of Soc. Sec.*, 2011 WL 4007661, at *7 (N.D. Ohio 2011) (hypothetical limiting plaintiff to "simple, repetitive, non-productive type of job tasks" is insufficient to convey moderate limitations in concentration, persistence, and pace); *Candela v. Astrue*, 2011 WL 3205726, at *10–11 (N.D. Ohio 2011) (hypothetical of "low stress simple repetitive type tasks with no frequent interaction with coworkers or the general public" does

not take into consideration moderate limitations as to concentration and persistence).

Some courts in this district have taken the position *Ealy* stands not for the general proposition that moderate limitations in concentration, persistence, and pace require more than a simple, repetitive tasks restriction; rather, some say *Ealy* "stands for a limited, fact-based[] ruling in which the claimant's particular moderate limitations required additional speed- and pace-based restrictions." *Todd v. Astrue*, 2012 WL 2576435, at *11 (N.D. 2012) (citing *Jackson v. Comm'r of Soc. Sec.*, 2011 WL 4943966, at *4 (N.D. Ohio 2011)). Even if this narrower interpretation is correct, though, the result in this case is the same.

Here, a multitude of medical sources determined Plaintiff has at least moderate difficulties in maintaining concentration, persistence, or pace, and several determined Plaintiff has specific deficiencies in his ability to keep and maintain pace. The ALJ did not debunk these limitations, and in fact inherently adopted them by his very language in the hypothetical. Psychologist James Cozy said Plaintiff is extremely limited in his ability to maintain attention and concentration for extended periods, his ability to perform activities within a schedule, his ability to work in proximity to others without being distracted by them, and his ability to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 253). Cozy also wrote Plaintiff has "some difficulty with memory and attention" and "is easily distracted". (Tr. 254). Psychiatrist Dr. Ugboma and medical consultant Dr. Cruz both determined Plaintiff has moderate limitations in his ability to maintain attention and concentration for extended periods. (Tr. 294, 411). Dr. Cruz also determined Plaintiff is markedly limited in his ability to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 411). Plaintiff's therapist Craig Palmer reported Plaintiff has extreme limitations in his ability to maintain attention and concentration for extended periods, to

27

sustain an ordinary routine without supervision, to perform activities within a schedule, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 418).

The ALJ expressly stated that the hypothetical individual has certain limitations "as a result of moderate limitations in concentration, persistence, or pace." (Tr. 68). In other words, the ALJ intended to adopt the limitation of moderate difficulties in concentration, persistence, and pace that is well-established in the record. But his hypothetical ultimately failed to convey this limitation. Indeed, "requiring at most only simple and routine, one or two step activities or tasks" falls short of being a proxy for these limitations, and puts this case squarely within the dictates of *Ealy*. Adding the further limitation of one- or two-step tasks does not adequately accommodate for moderate pace or concentration difficulties. *Brown v. Comm'r of Soc. Sec.*, 672 F.Supp.2d 794, 797 (E.D. Mich 2009) (finding limitation to work that consists of simple, routine, repetitive, one- or two-step tasks insufficient to convey a claimant's moderate limitation in concentration, persistence, and pace); *Badour v. Comm'r of Soc. Sec.*, 2011 WL 3320872, at *7 (E.D. Mich 2011) ("the 'one to two step tasks' limitation, by itself, is insufficient to address moderate concentrational problems, *i.e.*, staying on task for an entire work shift").

The Commissioner, without citing *Ealy* or arguing it is inapplicable here, points the Court to *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001), but that case is plainly distinguishable. There, the claimant had deficiencies in concentration, persistence, or pace, but was "able to sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function", per her RFC assessment. *Howard*, 255 F.3d at 582. In other words, the medical evidence showed claimant did not have moderate difficulties in sustaining concentration, persistence, and pace that needed to be accommodated by further

28

restriction beyond the limitation to simple, repetitive tasks.

The Commissioner also cites *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), to argue the ALJ's limitations were significant and fully incorporated into his hypothetical because the ALJ outlined how Plaintiff's mental limitations affected his ability to work. But *Halter* is similarly distinguishable. In that case, not only did the issue involve one report the claimant "often" had problems concentrating instead of treating sources indicating he had "moderate" concentration difficulties, but "the ALJ relied on the testimony of four physicians who characterized [the claimant's] concentration problems as minimal or negligble." *Id.* Here, the ALJ showed by his own language that he intended to incorporate a moderate limitation in concentration, persistence, or pace into his hypothetical. (Tr. 68). Plus, as outlined above, there is insubstantial evidence suggesting Plaintiff has less than moderate difficulties maintaining concentration, persistence, or pace. Ultimately, this case typifies the teaching of *Ealy*, and remand is necessary so the Commissioner can hear new VE testimony that supports a step five determination.

### CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Commissioner's decision denying benefits is unsupported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be reversed, and the case remanded to the Commissioner for further proceedings consistent with this opinion.

                                  <ins>    s/James R. Knepp, II    </ins>
                                  United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES

the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).